IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BERNADETTE BELL, an individual; and BARRY BELL, an individual,<br><br>   Plaintiffs,<br><br>v.<br><br>JUDGE MEMORIAL CATHOLIC HIGH SCHOOL; and ROMAN CATHOLIC BISHOP OF SALT LAKE CITY dba CATHOLIC DIOCESE OF SALT LAKE CITY,<br><br>   Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00829-RJS-JCB<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Jared C. Bennett |

Plaintiff Barry Bell filed this action against his former employer, Defendant Judge Memorial Catholic High School (JMCHS) and the Roman Catholic Bishop of Salt Lake City dba Catholic Diocese of Salt Lake City (Diocese), alleging Defendants discriminated against him in violation of the Age Discrimination in Employment Act (ADEA).[1]  Now before the court is Defendants' Motion for Summary Judgment, seeking summary judgment on Bell's claim on the grounds that (1) he cannot demonstrate his age was a determinative factor in JMCHS's decision to not renew his teaching contract, and (2) the ministerial exception applies to bar liability for JMCHS's decision.[2]  For the reasons discussed below, Defendants' Motion is DENIED.

---

[1] *See* Dkt. 2, *Complaint*.

[2] Dkt. 26 at 7–14.  Bernadette Bell is also a plaintiff in this action.  However, Defendants stated they have resolved her claims, and the parties intend to submit a stipulated motion of dismissal on her claims.  *See id.* at 2 n.1; Dkt. 30, *Plaintiff's Opposition to Defendants' Motion for Summary Judgment* at 9.  Her termination is only discussed to the extent it is relevant to Defendants' justification for terminating Barry Bell.

# BACKGROUND

At summary judgment, the court reviews the parties' agreed-upon factual record and draws all reasonable inferences therefrom in favor of Bell, the nonmovant.[3]  The following facts are drawn from the parties' summary judgment briefing and attached affidavits and exhibits,[4] and are not genuinely in dispute, unless otherwise indicated.[5]  They are admitted to the record for summary judgment purposes.

## I.   Summary Judgment Record of Bell's Termination

Bell was an experienced educator when he started working at JMCHS during the 2006–2007 school year, first as a substitute teacher coordinator and later as a special education and social studies teacher, among other positions.[6]  As with other educators at JMCHS, Bell worked under successive, one-year contracts.[7]  The last contract offered to Bell was for the 2018–2019 school year, when he taught social studies part-time and continued serving as a substitute teacher coordinator.[8]  During that period and the preceding school year, Bell received generally favorable classroom evaluations by Vice Principal Louise Hendrickson, with notes that his students were "comfortable," "attentive," and engaged.[9]

---

[3] *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).

[4] *See* Fed. R. Civ. P. 56(c); 28 U.S.C. § 1746; *see also Vazirabadi v. Denver Health and Hosp. Auth.*, 782 F. App'x 681, 687–88 (10th Cir. 2019).

[5] The parties present numerous factual disputes in their respective briefs.  *See* Dkt. 30 at 4–6; Dkt. 33, *Defendants' Reply in Support of Motion for Summary Judgment* at 2–5.  To the extent disputed facts are relevant to the parties' arguments at summary judgment, the court resolves those disputes herein as they arise.  Genuine disputes of material fact are stated as such.  The court refrains from making any judgment on factual disputes immaterial to resolving the parties' summary judgment motions.

[6] Dkt. 26 at 2–3; Dkt. 30 at 6–7.

[7] Dkt. 26 at 2–3; *see also* Dkt. 26-4, *Exhibit C: Employment Contracts*.

[8] Dkt. 26 at 3–5.

[9] *See* Dkt. 30-8, *Exhibit 7: Classroom Observations*.

By the fall of 2018, however, Bell was placed on a corrective action plan.[10]  The parties dispute the reasons for the corrective action plan.  Defendants maintain that it was largely due to Bell's "negative interactions with JMCHS's administration and his colleagues,"[11] while Bell counters that the corrective action plan was "styled as a first written warning" and was "part of a discriminatory pattern during the 2017–2018 and 2018–2019 school years in which JMCHS falsely accused Bell of misconduct."[12]  In any event, on April 17, 2019, JMCHS notified Bell that it would not be renewing his teaching contract for the upcoming school year.[13]  The decision was made by two key administrators at JMCHS: Principal Patrick Lambert and Hendrickson.[14]

In addition to stating that Bell had a difficult relationship with JMCHS staff and faculty[15]—a claim Bell disputes[16]—Defendants contend his termination was part of a net reduction in force (RIF), caused by "declining enrollment" and a concomitant need for fewer teachers.[17]  Given these pressures, Defendants aver JMCHS reviewed its slate of social studies teachers and determined that both Bell, then 65 years old, and Eve Grenlie, then 39 years old, "were not as effective teachers in the classroom as the other social studies teachers, and . . .

---

[10] *Id.* at 4–5; *see also* Dkt. 26-10, *Exhibit I: Corrective Action Plan*.

[11] Dkt. 26 at 4–5; *see also* Dkt. 26-10 at 4 ("Mr. Bell lost his temper with Vice Principal Hendrickson.  This occurred during a meeting between the two regarding concerns brought up related to his interactions with a coworker.").

[12] Dkt. 30 at 4; *see also* Dkt. 26-10 at 5–6 (reflecting Bell's various objections to the corrective action plan).

[13] *See* Dkt. 26 at 5; Dkt. 30-4, *Exhibit 3: Barry Bell Deposition* at 39:14–19; *see also* Dkt. 26-11, *Exhibit J: Notification of Non-Renewal*.

[14] *See* Dkt. 26-13, *Exhibit L: Defendants' Amended Responses to Interrogatories* at 8.  Defendants also suggest "[i]t is possible that the decision . . . was discussed with JMCHS's Executive Board, but if it was raised with the Executive Board, the discussion was fairly brief."  Because JMCHS cannot confirm whether or not the employment decision was discussed with the Executive Board, Defendants aver that the decision was made by Lambert and Hendrickson.  *Id.*

[15] *See* Dkt. 26 at 4–5.

[16] *See* Dkt. 30 at 4; *see also* Dkt. 30-4 at 32:1–34:25 (reflecting Bell's understanding of his colleagues' complaints against him).

[17] Dkt. 26 at 5; *see also* Dkt. 26-12, *Exhibit K: Employee Separation Reports*.

decided to not offer teaching contracts to either teacher."[18]  Instead of retaining these teachers, Defendants determined they could replace both of them with a single, more effective teacher.[19] Defendants offered several additional reasons for JMCHS's decision to select Bell for the RIF, ranging from Lambert's determination that Bell was not an effective classroom teacher to the purported negative interactions between Bell and his colleagues.[20]

Bell disagrees with Defendants' stated reason for the termination and argues the RIF—purportedly affecting only him, his wife, and Grenlie[21]—was pretextual.[22]  The real reason for his termination, he counters, can be gleaned from the "subjective and ageist characterizations" given by JMCHS leaders during the course of litigation and a pattern of discrimination he argues can be shown by the school's 2019–2020 employee changes.[23]  Additionally, Bell contends his termination was preceded by numerous unwarranted critiques and disciplinary actions by JMCHS administrators.[24]  Finally, he avers Lambert explained the non-renewal at the time saying only that the school was "going in a new direction."  Bell argues that the RIF was adopted a month later only as a post-hoc justification for his termination.[25]

Regardless of the reasoning for Bell's termination, the parties do not dispute that two days before Bell was notified of his non-renewal, Defendants hired Jonathan Garrison, then 33

---

[18] Dkt. 26 at 5–6; *see also* Dkt. 26-13 at 8.

[19] Dkt. 26 at 6.

[20] *See, e.g.*, Dkt. 26 at 9; Dkt. 30-2, *Exhibit 1: Patrick Lambert Deposition* (Lambert Deposition) at 106:13–108:25 (stating that "the two main factors" for Bell's selection for the RIF were his "interactions with teachers" and his "teaching abilities"); Dkt. 26-13 at 8–10.

[21] *See* Dkt. 30 at 4–5 (citing Lambert Deposition at 140:15–141:12; Dkt. 30-3, *Louise Hendrickson Deposition* (Hendrickson Deposition) at 112:21–24).

[22] *See* Dkt. 30 at 23–31.

[23] *Id.*

[24] *See id.* at 30.

[25] *Id.* at 9 (citing Dkt. 30-4 at 3:14–19); *see also* Lambert Deposition at 131:6–132:10.

years old, for the 2019–2020 school year.[26]  Garrison's employment contract provided that he would serve as a teacher with additional paid responsibilities "moderating Student Council" and "covering the Substitute Coordinator duties."[27]  During the 2019–2020 school year, Garrison was assigned to teach numerous social studies courses,[28] which Bell avers he was qualified to teach.[29]  Garrison did not teach any psychology courses, which had previously accounted for much of Grenlie's courseload.[30]  As discussed below, the parties dispute whether Garrison was hired as a replacement for Grenlie or Bell, with Defendants generally taking the former position and Bell the latter.[31]

On May 9, 2019, several weeks after Bell was notified of his non-renewal, Lambert told Bernadette Bell she was being terminated as part of a RIF.[32]  Thereafter, JMCHS Advisory Board Meeting Minutes for May 14, 2019, reflected that "[t]here [would] be a slight [RIF] for 2019–2020."[33]  Several days later, Lambert signed a separation report for Barry Bell, stating,

---

[26] Dkt. 30 at 10 (citing Dkt. 30-9, *Exhibit 8: Garrison Employment Contract*; Dkt. 30-11, *Defendants' Responses to Plaintiffs' Third Set of Discovery Requests to Defendants*).

[27] Dkt. 30-9 at 2.

[28] *See* Dkt. 30-12, *Exhibit 11: Class Schedules* (comparing Garrison's teaching schedule and Bell's past teaching schedules).

[29] *See* Dkt. 30 at 11 (citing Lambert Deposition at 90:11–16; Hendrickson Deposition at 28:14–17).

[30] *See* Dkt. 30-12 (contrasting Garrison's teaching schedule and Grenlie's past teaching schedules); Lambert Deposition at 134:5–10 (confirming that Garrison did not teach the psychology courses previously taught by Grenlie).

[31] *Compare* Dkt. 26 at 6 (reflecting Defendants' position that they decided "to hire one new teacher to teach social studies full time, and to assign Mr. Bell's other responsibilities . . . to existing faculty and administration"), Lambert Deposition at 133:6–10 (reflecting Lambert's understanding that Garrison "was replacing a full-time teacher, Eve Grenl[ie], but . . . that in th[e] initial contract, . . . some of Barry [Bell's] duties would be moved over to him in the form of substitute coordinating."), *and* Dkt. 33 ("Garrison was hired to fill the position left vacant by Grenlie."), *with* Dkt. 30 at 10–11 (arguing that Garrison was hired to replace Bell).

[32] *See* Dkt. 30-17, *Bernadette Bell Deposition* at 42:7–45:11.

[33] Dkt. 30-6, *Advisory Board Meeting Minutes for May 14, 2019*.

among other things, that the "Reason for [Bell's] Separation" was a permanent RIF and that the separation was not related to "any prior disciplinary action."[34]

In September 2019, Bell filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging age discrimination by Defendants.[35]  Approximately one year later, the EEOC closed the case and returned a Notice of Right to Sue,[36] prompting the instant action.[37]  Following the close of fact and expert discovery, Defendants filed their Motion, seeking summary judgment on the grounds that (1) Bell "cannot demonstrate that his age was a factor, let alone the determinative factor, in JMCHS's decision to not offer him a new teaching contract" and (2) "the ministerial exception applies to [his] claim . . . and [] protects JMCHS's decision to hire and fire ministers within the school."[38]  Defendants' Motion has been fully briefed, oral argument was heard on April 18, 2023,[39] and the matter taken under advisement.

## II.     Summary Judgment Record of Bell's Religious Responsibilities at JMCHS

Because Defendants invoke the "ministerial exception," a doctrine that generally turns on whether a religious institution's former employee "performed vital religious duties" or was "entrusted most directly with the responsibility of educating . . . students in the faith,"[40] a brief discussion of JMCHS's ecumenical and pedagogical stances are also warranted.  Furthermore, Defendants' argument for summary judgment requires an overview of the relevant facts

---

[34] Dkt. 26-12 at 2.

[35] *See* Dkt. 2-2, *Exhibit A: Charges*.

[36] *See* Dkt. 2-3, *Exhibit B: Notice of Right to Sue*.

[37] *See* Dkt. 2.

[38] Dkt. 26 at 14.

[39] Dkt. 36, *Minute Entry for Proceedings on May 18, 2023*.

[40] *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2066 (2020).

surrounding Bell's tenure at JMCHS, with a focus on his religious responsibilities and expectations.[41]

As its name suggests, JMCHS is a Catholic high school serving grades 9–12.  It seeks "to create a Christian educational community where knowledge is enlightened and enlivened by faith."[42]  As part of this "distinct purpose," JMCHS's teaching contracts require teachers, including Bell, to acknowledge that "Catholic Schools are ministries of the Catholic Church within the diocese of Salt Lake City and not simply places where secular subjects are taught."[43]  Additionally, JMCHS's contract requires faculty to acknowledge the following guiding principles:

> That those who instruct and mentor youth in Catholic Schools are in positions of trust and authority and are looked up to by those same youth, and that therefore personal behavior and acting responsibly and morally in one's own life is vital; the school is an expressive religious association that exists to instill Gospel teachings and value; that, although an Equal Opportunity Employer, that does not prevent the school from employing and retaining teachers based upon religious beliefs.[44]

Nevertheless, JMCHS does not refrain from hiring teachers—such as Bell—who are not Catholics.[45]  However, school policy requires that they "understand and are fully committed to the distinctive purpose, philosophy, and spirit of Catholic school education," and "live within the Catholic spirit and teachings regarding lifestyle."[46]  Additionally, non-Catholic teachers are barred from "teach[ing] a Catholic religion class."[47]

---

[41] See Dkt. 26 at 10–13.

[42] See Dkt. 26 at 2; Dkt. 26-5, *Exhibit D: Policy 2200 of the Diocese's Administrative Handbook* at 4.

[43] Dkt. 26 at 3; Dkt. 26-4, *Exhibit C: Barry Bell Employment Contracts*.

[44] Dkt. 26-4 at 2.

[45] Dkt. 26-5 at 4 ("If a Catholic teacher is not available, or when deemed otherwise appropriate, a non-Catholic may be employed.").

[46] *Id.*

[47] *Id.*

The parties do not dispute that Bell was neither an adherent of the Catholic faith nor a teacher of any religion classes during his time at JMCHS.[48]  Nevertheless, Defendants suggest his role as a teacher and administrator at JMCHS came with heightened religious expectations, which were repeatedly referenced by his teaching contracts[49]—namely, that he "[s]upport and implement[] the mission/philosophy of Catholic education and the school," "[g]ive[] evidence of lived Gospel values," and "[p]articipate[] in building faith community."[50]  Defendants maintain these obligations, and other expectations of JMCHS educators, support their contention "that Bell was a minister during his employment at JMCHS."[51]  Bell disputes Defendants' characterization of his tenure at JMCHS and notes that he did not teach any theology courses, did not lead his students during religious services, and was not required to obtain any religious training[52]—facts Defendants accept as true for summary judgment purposes.[53]

Having discussed the record set forth in the parties' briefings and attached affidavits and exhibits, the court next turns to the legal standards governing the parties' dispute.

## LEGAL STANDARDS

Summary judgment is proper so long as "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[54]  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence

---

[48] *See* Dkt. 30 at 17 (citing Dkt. 26-3, *Exhibit B: Employment Application*); Dkt. 33 at 18–20.

[49] *See* Dkt. 26 at 10–13; Dkt. 33 at 15–20.

[50] *See* Dkt. 26-5 at 2.

[51] *See* Dkt. 33 at 15.

[52] Dkt. 30 at 36.

[53] Dkt. 33 at 19.

[54] Fed. R. Civ. P. 56(a).

is such that a reasonable jury could return a verdict for the nonmoving party."[55]  In applying

these standards, the court views the evidence and draws inferences in the light most favorable to

the nonmoving party.[56]

At summary judgment, the moving party bears "both the initial burden of production on a

motion for summary judgment and the burden of establishing that summary judgment is

appropriate as a matter of law."[57]  To meet this burden, however, the moving party "need not

negate the non-movant's claim, but need only point to an absence of evidence to support the non-

movant's claim."[58]

If the moving party satisfies its initial burden, the nonmoving party must "bring forward

specific facts showing a genuine issue for trial as to those dispositive matters for which it carries

the burden of proof."[59]  In doing so, the moving party must produce competing evidence—borne

out "by reference to affidavits, deposition transcripts, or specific exhibits"[60]—that is "based on

more than mere speculation, conjecture, or surmise."[61]

## ANALYSIS

As prefaced above, Defendants raise two distinct arguments for summary judgment on

Bell's ADEA claim.  First, Defendants assert Bell cannot sustain his claim because he "cannot

demonstrate that his age was a factor, let alone the determinative factor, in JMCHS's decision to

---

[55] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[56] *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

[57] *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (internal quotation marks and citations omitted).

[58] *Id.*

[59] *Id.*

[60] *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998).

[61] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

not offer him a new teaching contract."[62]  Second, Defendants argue Bell fell under the
ministerial exception, thereby shielding their decision to terminate him from the scrutiny of this
court.[63]  For the reasons discussed herein, the court concludes both arguments are unavailing and
DENIES Defendants' Motion.

## I.     Genuine Issues of Material Fact Preclude Summary Judgment

Defendants' first argument for summary judgment is that "JMCHS did not discriminate
against Mr. Bell when it decided not to offer him a new teaching contract for the next academic
year," and Bell cannot sustain his burden of proving otherwise.[64]

### a.  Prima Facie Case

ADEA prohibits age discrimination in employment, making it unlawful for an employer
"to discharge any individual or otherwise discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of employment, because of such individual's
age."[65]  Importantly, ADEA requires age to be "the reason the employer decided to act" or the
"but-for" cause of the adverse action.[66]  However, the Tenth Circuit recognizes that the presence
of other but-for causes does not necessarily preclude an ADEA claim, so long as "age was the
factor that made a difference."[67]

A plaintiff can bring an ADEA claim based on direct or circumstantial evidence of
discrimination.[68]  If a plaintiff's claim is based on circumstantial evidence, as relevant here,

---

[62] Dkt. 26 at 7–9, 14.

[63] *Id.* at 10–14.

[64] *Id.* at 7.

[65] 29 U.S.C. § 623(a)(1).

[66] *Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 947 (10th Cir. 2011) (quoting 29 U.S.C. § 623(a)).

[67] *Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1277 (10th Cir. 2010) (internal quotation marks and citations omitted).

[68] *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017).

courts apply the "three-part burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*."[69]   At the first step of this framework, the plaintiff must establish a prima facie case of wrongful termination.[70]   If the plaintiff can establish a prima facie case, the burden then shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."[71]   If the employer makes such a showing, the burden shifts back to the plaintiff "to prove . . . that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination."[72]

The Tenth Circuit applies a four-factor test for establishing a prima facie case under ADEA, however, several different versions of the test have been articulated.[73]   Generally, the first three elements of the test are the same—the plaintiff must show that: "(1) he is within the protected age group; (2) he was doing satisfactory work; [and] (3) he was discharged."[74] However, "the fourth element of a prima facie case is a flexible one that can be satisfied differently in varying scenarios."[75]   Among other formulations, the Tenth Circuit has variously defined the fourth element as requiring evidence of the plaintiff's "replacement by a younger worker," "evidence giving rise to an inference of discrimination," or "treatment less favorable than other similarly-situated employees outside the protected class."[76]   In the specific context of

---

[69] *Id.* at 969 (citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973)).

[70] *Id.*

[71] *Id.*

[72]  *Simmons*, 647 F.3d at 947.

[73] *See, e.g.*, *Larsen v. Granger Med. Clinic*, No. 2:17-CV-01308-DBP, 2018 U.S. Dist. LEXIS 179390, at *6 (D. Utah Oct. 17, 2018) (discussing some of the variations in the Tenth Circuit's four-factor test); *Fullington v. Ill. Tool Works Inc.*, No. 21-2287-DDC-KGG, 2022 U.S. Dist. LEXIS 184586, at *13 (D. Kan. Oct. 7, 2022) (same).

[74] *See Rangel v. Sanofi Aventis U.S., LLC*, 507 F. App'x 786, 790 (10th Cir. 2013) (citing *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 920 (10th Cir. 2004)).

[75] *Plotke v. White*, 405 F.3d 1092, 1099–1100 (10th Cir. 2005).

[76] *See Larsen*, 2018 U.S. Dist. LEXIS 179390, at *6 (collecting cases).

a RIF, the Tenth Circuit has further modified the fourth element to account for the difficulty a plaintiff faces "proving actual replacement by a younger employee."[77]  In these cases, the fourth element may be established "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the [RIF]."[78]

Defendants do not dispute the first three elements of Bell's prima facie case, at least for summary judgment purposes.[79]  Indeed, the uncontested record generally shows Bell was a member of the protected age group,[80] performed satisfactory work,[81] and was discharged despite the adequacy of his work.[82]  However, the parties disagree whether Bell satisfies the fourth element, and offer different versions of the prima facie test to support their positions.[83]  While Defendants argue that Bell needs to satisfy the RIF-specific showing of "some evidence the[y] intended to discriminate against [him]" as part of their RIF decision,[84] Bell counters that the traditional showing of replacement by a younger worker suffices.[85]

Regardless of the exact wording used for the fourth element, the Tenth Circuit is clear that the elements of a prima facie case are "neither rigid nor mechanistic."[86]  Instead, "their

---

[77] *Branson v. Price River Coal Co.*, 853 F.2d 768, 771 (10th Cir. 1988).

[78] *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006) (quoting *Beaird v. Seagate Tech.*, 145 F.3d 1159, 1165 (10th Cir. 1998)).

[79] *See* Dkt. 26 at 9 (disputing only the fourth element); Dkt. 30 at 21.

[80] *See* Dkt. 30 at 9 (citing Dkt. 30-4 at 39:14–19 (testifying to a birth year of 1954)).

[81] *See* Lambert Deposition at 108:11–13 ("I would say he was able to perform the task at hand.  I wouldn't say he was one of our . . . most innovative teachers."); Hendrickson Deposition at 29:2–9 (stating that Bell "efficiently fill[ed] . . . classrooms" as part of his role as substitute coordinator); Dkt. 30-8 (showing generally favorable classroom evaluations).

[82] *See* Dkt. 26 at 7–9 (summarizing the reasons for Defendants' decision to terminate Bell); *see also* Lambert Deposition at 112:1–113:22 ("And for reason for separation, that's probably the most important part, that there was a reduction in force.").

[83] *See* Dkt. 26 at 9 ("The parties dispute whether Mr. Bell has satisfied the fourth element."); Dkt. 30 at 21.

[84] Dkt. 26 at 9 (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1199-200 (10th Cir. 2008)).

[85] Dkt. 30 at 21–22 (citing *Rangel*, 507 F. App'x at 790).

[86] *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008).

purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor."[87]  "The critical prima facie inquiry . . . is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances of unlawful discrimination."[88]  Notably, the Tenth Circuit has repeatedly found this requirement is met where "circumstantial evidence [shows] that, during the RIF, the employer discharged the plaintiff but retained or placed a younger employee in a similar position."[89]  Additionally, replacement by a younger worker has also been found to supply the necessary inference of discrimination to state a prima facie case under ADEA.[90]

Here, the parties dispute whether Bell was replaced by a younger worker.[91]  Defendants contend that Garrison was either hired to replace Grenlie[92]—the only person other than Bell and his wife purportedly affected by the RIF[93]—or to replace both Bell and Grenlie.[94]  For his part, Bell presents evidence showing Defendants hired Garrison, aged 33 years, on April 15, 2019, for

---

[87] *Id.*

[88] *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000).

[89] *Rangel*, 507 F. App'x at 790.

[90] *See, e.g., Maughan v. Alaska Airlines, Inc.*, 281 F. App'x 803, 806 (10th Cir. 2008) (holding that a plaintiff who was over the age of 60 when he was terminated was able to state a prima facie case by presenting evidence that he was replaced by a man who was 40 years old); *Beaird*, 145 F.3d at 1168 (concluding plaintiffs stated a prima facie case by demonstrating that they were terminated while "at least one" younger employee was retained); *see also DeSanzo v. AHS Southcrest Hosp., LLC*, No. 18-CV-352-JED-JFJ, 2020 U.S. Dist. LEXIS 39313, at *12 (N.D. Okla. Mar. 6, 2020) (finding that an age difference of seven years between the terminated employee and her replacement was "sufficient to support the necessary inference of discrimination").

[91] *Compare* Dkt. 30 at 22 ("Bell was replaced by a younger, less experienced individual."), *with* Dkt. 33 at 6 – 7 ("Bell was not replaced by a younger employee. . . . JMCHS eliminated a social studies position as part of its RIF and redistributed Bell's substitute coordinator duties to JMCHS administrators and staff.").

[92] *See, e.g.*, Lambert Deposition at 131:14–20 ("What I had in mind was that . . . Garrison would be replacing Eve Grenl[ie]'s major duties"), 132:6–10 (stating that Bell's "position was no longer offered," but Grenlie's position was "replaced"), 133:6–10 (stating Grenlie's position was replaced, but conceding that some of Bell's responsibilities were allocated to Garrison as part of his employment contract).

[93] *See* Lambert Deposition at 141:1–12 (stating that only the Bells and Grenlie were affected by the RIF).

[94] *See* Dkt. 26 at 6 (explaining JMCHS's determination that "it could hire one teacher who would be more effective in the classroom to replace both Mr. Bell and Ms. Grenlie"); Dkt. 33 at 6–7 (stating that JMCHS eliminated a social studies position and redistributed the substitute coordinator duties to other administrators and staff).

the purpose of teaching social studies and "covering the Substitute Coordinator duties,"[95] which were responsibilities held by Bell during his recent tenure at JMCHS.[96]  Only two days later, Lambert notified Bell his teaching contract would not be renewed for the 2019–2020 school year,[97] delivering a Notice of Non-Renewal that was originally dated for the same day Defendants hired Garrison.[98]  Although Garrison did not end up serving as a substitute coordinator,[99] it is uncontested that he taught social studies courses that could have been taught by Bell and was initially hired to fill Bell's substitute coordinator responsibilities as well.[100]

Viewing the evidence in the light most favorable to Bell, the court concludes he has satisfied his burden of establishing a prima facie case.  Indeed, his burden at this stage "is not onerous,"[101] and only a "small amount of proof [is] necessary to create an inference of discrimination."[102]  As discussed, Bell has presented admissible evidence suggesting he was replaced by Garrison.  This evidence, when construed in the light most favorable to Bell, could support a reasonable finding that Defendants sought to replace Bell's position rather than eliminate it completely, and then hired a much younger man to fill it.  The hiring of a man nearly half Bell's age only two days before he was notified of JMCHS's decision not to renew his

---

[95] *See* Dkt. 30 at 10–11; Dkt. 30-9; Dkt. 30-12 at 2.

[96] *See* Dkt. 26 at 4–6 (describing Bell's responsibilities during the 2018–2019 school year); Dkt. 30 at 6; Dkt. 30-12 at 3–4, 6–7.

[97] *See* Dkt. 26 at 5.

[98] *Compare* Dkt. 26-11 (showing the day of "April 15, 2019" was crossed out and replaced with a handwritten "17"), *with* Dkt. 30-9 (reflecting a signature date of April 15, 2019).

[99] *See* Hendrickson Deposition at 86:7–21 (stating that the plan was to have Garrison take the substitute coordinator duties, but it was later given to another teacher).

[100] *Id.* at 86:7–21, 90:11–20 (stating Bell was "credentialed to teach social studies"); Dkt. 30-12 at 2.

[101] *Bennett v. Windstream Communs., Inc.*, 792 F.3d 1261, 1267 (10th Cir. 2015) (internal quotation marks and citation omitted).

[102] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).

contract could permit a reasonable factfinder to conclude Bell's termination gives rise to an inference of age discrimination.[103]   Therefore, the court rejects Defendants' contention that Bell has not stated a prima facie case of age discrimination.

### b.  Defendants' Legitimate, Non-Discriminatory Reason

Once a plaintiff has met his burden of establishing a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action.[104]   The burden at this stage is "exceedingly light,"[105] as its stated reasons need only be legitimate and non-discriminatory "on their face."[106]   "The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."[107]   Here, Defendants maintain Bell was terminated as part of a RIF that was prompted by decreased student enrollment.[108]   He was selected for the RIF, Defendants aver, because he "was not as effective an educator when compared to the [rest of the] faculty."[109]   Defendants' stated reason is sufficient to meet their burden at this stage.[110]

---

[103] *See Fullington v. Ill. Tool Works Inc.*, No. 21-2287-DDC-KGG, 2022 U.S. Dist. LEXIS 184586, at *16–17 (D. Kan. Oct. 7, 2022) ("A 10-year age difference could permit a reasonable jury to find that plaintiff was replaced by a younger person, giving rise to an inference of age discrimination.").

[104] *DePaula*, 859 F.3d at 969 (citing *McDonnell Douglas*, 411 U.S. at 802).

[105] *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 899–900 (10th Cir. 2017).

[106] *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011).

[107] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 249 (1981) (footnote omitted).

[108] *See* Dkt. 26 at 5–6; Dkt. 26-13 at 6–9.

[109] Dkt. 26 at 9.

[110] *See Kawahara v. Guar. Bank & Trust*, No. 17-CV-02979-REB-KMT, 2019 U.S. Dist. LEXIS 230184, 2019 WL 8370803, at *3, *aff'd*, 835 F. App'x 386 (10th Cir. 2020) ("[T]he implementation of a RIF constitutes a legitimate, facially nondiscriminatory reason for [the] decision to terminate [an employee]."); *see also Beaird*, 145 F.3d at 1168 (holding the same).

### c. Pretext

Because Defendants have met their burden of providing a legitimate, non-discriminatory reason for Bell's termination, the burden shifts back to Bell to show a reasonable jury could find Defendants' proffered reason was pretextual.[111]  While "[t]his burden is not onerous . . . it is also not empty or perfunctory."[112]  A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[113]  In the context of a RIF, the Tenth Circuit has observed that a plaintiff typically establishes pretext by showing (1) his termination does not accord with the RIF criteria, (2) the RIF criteria were deliberately falsified to terminate him, or (3) that the RIF generally was pretextual.[114]  Further evidence of pretext "may include the following: prior treatment of plaintiff; the employer's policy and practice of employment regarding age (including statistical data); disturbing procedural irregularities . . . ; and the use of subjective criteria."[115]  Importantly, a plaintiff can establish pretext by presenting circumstantial evidence which on its own may be insufficient, because the court is "required to consider the totality of such circumstantial evidence" at this stage.[116]

---

[111] *DePaula*, 859 F.3d at 970 (internal quotation marks and citations omitted).

[112] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323–24 (10th Cir. 1997) (internal quotation marks and citation omitted).

[113] *Jones*, 617 F.3d at 1280 (internal quotation marks and citation omitted).

[114] *Beaird*, 145 F.3d at 1168; *see also Mueggenborg v. Nortek Air Sols., LLC*, No. 20-6147, 2021 U.S. App. LEXIS 30860, at *7 n.5 (10th Cir. Oct. 15, 2021) (unpublished) ("These are not the only ways to prove pretext in a RIF case, but most cases will fall into one of these categories.").

[115] *See Berry v. Airxcel, Inc.*, No. 20-1362-KHV, 2022 U.S. Dist. LEXIS 132853, at *20 (D. Kan. July 26, 2022) (citing *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999)).

[116] *Beaird*, 145 F.3d at 1174.

Bell offers several arguments to undermine Defendants' proffered reasons for the non-renewal.  First, he contends the RIF was a "post-hoc justification for [his] non-renewal" rather than the "actual reason for JMCHS's decision . . . not to renew [his] contract."[117]  Even assuming the RIF was needed to cut costs, Bell maintains that the decision to hire a less-experienced, much younger man rather than retain Bell—seemingly without explanation—evinces discriminatory animus.[118]  Bell points to depositions from JMCHS administrators, which he argues show Defendants' decision was "based on assumptions and stereotypes about older persons."[119]  Bell next challenges Defendants' contentions that he was not an effective educator as contrary to the record.[120]  Finally, Bell avers his non-renewal was part of Defendants' "pattern and practice of eliminating older works and hiring younger workers."[121]

Although not all of these arguments are availing, considering "the totality of [the] circumstantial evidence" presented by Bell, the court concludes he has "create[d] a genuine issue of material fact whether a discriminatory reason more likely motivated [Defendants] or that [Defendants'] stated reasons are unworthy of credence."[122]

Bell first contends the purported RIF was little more than a "post-hoc justification for [his] non-renewal," lacking "contemporaneous documentation of any good-faith process" by which JMCHS decided to conduct the RIF or determine which positions to eliminate.[123]  Courts

---

[117] Dkt. 30 at 23.

[118] *Id.* at 25–26.

[119] *Id.* at 26–28 (citing Lambert Deposition at 108:8–10, 135:5; Hendrickson Deposition at 38:1–13, 77:1–6, 80:25–81:1).

[120] *Id.* at 28–29.

[121] *Id.* at 30–31.

[122] *Cf. Berry*, 2022 U.S. Dist. LEXIS 132853, at *23 (explaining a plaintiff's burden to show pretext under ADEA (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994))).

[123] Dkt. 30 at 23–24.

have widely recognized that "[p]ost-hoc justifications for termination constitute evidence of pretext."[124]  Relatedly, "[o]ne can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."[125]  "But the 'mere fact that the [employer] has offered different explanations for its decision does not create a genuine question of pretext.'"[126]  Rather, the Tenth Circuit has "recognized that inconsistency evidence is only helpful to a plaintiff if 'the employer has changed its explanation under circumstances that suggest dishonesty or bad faith.'"[127]

While the court does not "quibble with the reasonableness or legitimateness of a layoff decision premised on the expendability of positions,"[128] Bell has presented several compelling reasons, taken together, why a reasonable factfinder might discredit Defendants' purported RIF. First, there is a distinct lack of records regarding the RIF until one month after Bell's notification of non-renewal.[129]  Even after JMCHS administrators adopted the label of "RIF" to describe the Bells' terminations, there are few records regarding the scope or structure of the purported RIF aside from a passing mention of a future RIF at the JMCHS Advisory Board meeting on May 14, 2019.[130]  In similar situations, courts have recognized that a lack of records regarding a RIF,

---

[124] *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020).

[125] *Mueggenborg*, 2021 U.S. App. LEXIS 30860, at *23 (internal quotation marks and citations omitted).

[126] *Id.* (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005) (per curiam)).

[127] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1002 (10th Cir. 2011) (quoting *Jaramillo*, 427 F.3d at 1310).

[128] *Paup v. Gear Prods.*, 327 F. App'x 100, 111 (10th Cir. 2009) (unpublished).

[129] *See* Dkt. 30 at 24 (describing the lack of record evidence of the RIF before May 14, 2019).

[130] *See* Dkt. 30-6.

"considered in conjunction with . . . other evidence of pretext," can strengthen a plaintiff's pretext argument.[131]

In addition to the lack of records, the highly subjective and vaguely defined criteria used to select Bell for non-renewal weighs against its credence.[132]  In her deposition, Hendrickson, one of the two administrators charged with selecting Bell for termination, described JMCHS's approach to RIFs as "more or less a numbers game," relying on "informal conversations—nothing that's documented on a spreadsheet."[133]  In other words, "[i]t's a puzzle, but it's not like a formal documentation [process] by any means."[134]  In determining selectees for the RIF, Hendrickson confirmed "there's not . . . a checklist of criteria" used by administrators.[135] Instead, they look at the "overall culture of the department, expertise, things like that."[136]  For his part, Lambert explained repeatedly that JMCHS's RIF selection process "looks at the full body of work" for a given teacher.[137]  Defendants offer various other explanations for Bell's selection, ranging from his negative relationships with certain colleagues to his disputed application of

---

[131] *See Mitchell v. Clean Harbors Env't Servs., Inc.*, No. CIV-21-829-SLP, 2023 U.S. Dist. LEXIS 18401, at *24 (W.D. Okla. Feb. 3, 2023) (denying summary judgment where, among other defects, there was a "lack of records regarding the structure of the RIF"); *see also Blair v. Henry Filters, Inc.*, 505 F.3d 517, 533–34 (6th Cir. 2007) (holding that a "lack an objective plan for the [RIF] creates a genuine issue of material fact regarding whether th[e] explanation is credible," where the "shedding of employees appears to have been chaotic, occurring in fits and starts"), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Kirsch v. St. Paul Motorsports, Inc.*, No. CIV. 11-2624, 2013 U.S. Dist. LEXIS 64911, at *13 (D. Minn. May 7, 2013) ("Where there is . . . no evidence of an objective plan for implementing a RIF, the legitimacy of the RIF may be called into question.").

[132] *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) ("Courts view with skepticism subjective evaluation methods such as the one here."); *Simms*, 165 F.3d at 1328 ("Evidence of pretext may include . . . the use of subjective criteria.").

[133] Hendrickson Deposition at 73:10–22.

[134] *Id.* at 73:24–74:1.

[135] *Id.* at 74:5–7.

[136] *Id.*

[137] *See* Lambert Deposition at 107:17–19, 131:6–8 ("I look at the full body of work, and I decided that we were going a different direction."), 132:22–133:1, 141:19–23 (describing the decision to select the Bells for the RIF was prompted by him "looking at full body of work and ability to work well with others").

classroom technology.[138]  While "the use of [such] subjective criteria . . . ordinarily is not by itself sufficient to establish pretext," a reasonable jury could on this record conclude that the opaqueness of Defendants' decisionmaking process and lack of contemporaneous documentation of the RIF determination weighs against the veracity of the purported RIF.[139]

Whether by happenstance or design, it is also relevant that the RIF was something of a family affair.[140]  While Defendants maintain the RIF affected Bell, his wife, and an unrelated teacher, Grenlie, the record is somewhat unsettled as to whether Grenlie was actually selected for the RIF,[141] resigned,[142] or was destined for termination despite the RIF.[143]  For example, Bell's separation report states that he was terminated pursuant to a RIF,[144] whereas Genlie's separation report selects "Other" as the "Reason for Separation" with a handwritten comment that the department decided "to go a different direction [and she] . . . was not offered a new contract."[145]

---

[138] *See, e.g.*, Dkt. 33 at 12–13 (explaining that Bell was terminated because of the RIF and he was selected because "JMCHS determined he was not as effective as other educators"); Dkt. 26-13 at 8–10 (offering several other reasons for Bell's selection); *see also* Lambert Deposition at 106:9–25 (explaining that the decision to select Bell for the RIF was prompted largely by his "negative interactions" with his coworkers), 108:5–25 (crediting Bell's negative interactions with fellow teachers and his "teaching abilities" as the drivers for his selection), 132:22–133:1 (crediting the "full body of work" and his negative relationships with his coworkers); Hendrickson Deposition at 75:12–22 (crediting the "lack of innovation" in the classroom and Bell's negativity with his colleagues).

[139] *See Bouricius v. Mesa Cty.*, No. 1:18-cv-01144-DDD-STV, 2020 U.S. Dist. LEXIS 259844, at *13 (D. Colo. Jan. 21, 2020) (denying summary judgment where the decisionmaker "made the decision based on a subjective analysis he performed in his own head, without document his reasons"); *Mitchell*, 2023 U.S. Dist. LEXIS 18401, at *24.

[140] *Cf. Wilkerson v. Schirmer Eng'g Corp.*, No. 04-cv-00258-WDM-OES, 2006 U.S. Dist. LEXIS 5581, at *10 (D. Colo. Jan. 30, 2006) (noting that "courts tend to be skeptical of one-person RIFs, and have held that the critical inference of discrimination arises when 'the terminated employee's duties are absorbed by other employees not in the protected class'" (collecting cases and quoting *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000))).

[141] *See* Dkt. 26 at 5–6 (discussing JMCHS's decision to select Bell and Grenlie for non-renewal); Dkt. 33 at 7 (same); *see also* Lambert Deposition at 141:1–9 (describing the RIF as affecting Grenlie and the Bells); Hendrickson Deposition at 112:21–24 (same).

[142] *See* Lambert Deposition at 131:4 – 6 ("I also had a full-time teacher, Eve Grenl[ie], that stepped down – or was nonrenewed"); Dkt. 30-4 at 40:16–41:3 (reflecting Bell's understanding that Grenlie had resigned).

[143] *See* Hendrickson Deposition at 112:17–20 (stating that Grenlie would have "[m]ost likely" been non-renewed regardless of the RIF, though cautioning that "she can't say for sure").

[144] Dkt. 26-12 at 2.

[145] *Id.* at 3.

Although the reasons for Grenlie's termination are hardly dispositive, the inconsistencies regarding the actual scope of the RIF could lead a reasonable factfinder to conclude that Bell and his wife, who were both members of the protected age group, were the primary—even exclusive—target of the RIF, sewing further doubt of the validity of Defendants' RIF.

Finally, mere days before Bell was notified of non-renewal, JMCHS hired a far younger and less experienced teacher with responsibilities at least partially overlapping Bell's. While Defendants variously characterize Garrison as a replacement for Grenlie, or a replacement for Grenlie and Bell,[146] the record evinces considerable overlap between his intended role and Bell's.[147] As noted above, he was hired to "cover the Substitute Coordinator" responsibilities and later assigned to teach social studies courses—hallmarks of Bell's recent tenure at JMCHS.[148] At the same time, he was not assigned to teach Grenlie's psychology courses, which constituted a substantial part of her teaching schedule.[149] Under these circumstances, a reasonable factfinder could conclude Bell's position—rather than Grenlie's—was filled by Garrison, thereby undermining the credence of Defendants' stated reason for Bell's termination.[150]

---

[146] *See, e.g.*, Dkt. 26 at 6 (describing JMCHS's determination that "it could hire one teacher . . . to replace both Mr. Bell and Ms. Grenlie"); Lambert Deposition at 133:6–10 (stating that Garrison "was replacing a full-time teacher, Eve Grenl[ie], but . . . that in th[e] initial contract, . . . some of Barry [Bell's] duties would be moved over to him in the form of substitute coordinating."); Dkt. 33 ("Garrison was hired to fill the position left vacant by Grenlie.").

[147] *See* Dkt. 30-9 (reflecting Garrison's commitment to cover the substitute coordinator position); Dkt. 30-12 at 2–4, 6–7 (comparing Garrison's second semester schedule with Bell's past schedules).

[148] *See* Dkt. 26 at 5 ("In the 2018–19 academic year, Mr. Bell was teaching social studies part time in addition to his role as substitute teacher coordinator."); Dkt. 30-9; Dkt. 30-12 at 2–4, 6–7.

[149] *See* Lambert Deposition at 134:5–10.

[150] *See Pippin*, 440 F.3d at 1194 (stating that a plaintiff can show pretext by "showing that the defendant actively sought to replace a number of RIF-terminated employees with new hires during the RIF general time frame"); *Beaird*, 145 F.3d at 1175 (concluding that a defendant's decision to "hir[e] into positions similar to [the plaintiff's] at the very time it claimed the elimination of [such] positions . . . was operationally required" was "certainly sufficient to support a finding of pretext").

Standing alone, some of these contradictions and doubts leave the veracity of Defendants' purported RIF nearly unscathed.  When viewed in their totality and in a light most favorable to Bell,[151] however, they paint a more uncertain picture.  In particular, the evidence presented by Bell could lead a reasonable jury to question Defendants' explanation for his non-renewal—noting, among other things, the lack of contemporaneous records regarding the RIF, vague and shifting explanations for Bell's selection, uncertain scope of the RIF, and the temporal proximity of Garrison's hiring.  At the same time, a reasonable jury could find Defendants' explanation for Bell's non-renewal entirely credible and lacking any modicum of discriminatory animus.  But it is not the court's role at summary judgment to determine Defendants' "true state of mind."[152]  Under these circumstances, Bell is entitled to have a jury resolve these genuine issues, and therefore, summary judgment must be denied.

Although Bell points to other evidence to support his argument that Defendants' proffered justification was pretextual, this evidence is far less persuasive at summary judgment than the factors noted above.  Nevertheless, the court is persuaded that Bell has presented "evidence sufficient to create a factual dispute regarding the veracity" of Defendants' purported RIF, even setting aside his less compelling theories of pretext.[153]  Accordingly, the court "presume[s] the jury could infer the employer acted for a discriminatory reason and must deny summary judgment."[154]

---

[151] *See Beaird*, 145 F.3d at 1174 (stating that courts are "required to consider the totality of such circumstantial evidence").

[152] *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) ("[I]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini-trial' to determine the defendant's true state of mind.").

[153] *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005).

[154] *Id.*

## II.   Defendants Have Not Shown that the Ministerial Exception Applies to Bell

Having determined Bell has presented enough evidence to survive summary judgment on the merits of his ADEA claim, the court next turns to Defendants' argument that the ministerial exception shields their decision to terminate Bell.

The ministerial exception arises out of the church autonomy doctrine and seeks to protect "the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion."[155]  In particular, the exception preserves religious institutions' "autonomy with respect to internal management decisions that are essential to the institution's central mission" by providing an affirmative defense against otherwise cognizable claims arising under employment discrimination laws.[156]  However, the ministerial exception does not afford religious institutions "a general immunity from secular laws," nor does it shield all employment decisions.[157]  Instead, the ministerial exception "applies . . . only to employment . . . claims asserted by a *minister*."[158]  Accordingly, "[t]he threshold determination for applying the ministerial exception is whether the plaintiff-employee qualifies as a minister."[159]

In recognizing the ministerial exception, the Supreme Court was "reluctant . . . to adopt a rigid formula for deciding when an employee qualifies as a minister."[160]  Instead, it "called on courts to take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception."[161]  In particular, the Court

---

[155] *Our Lady*, 140 S. Ct. at 2060 (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 186 (2012)).

[156] *Id.*

[157] *Id.*

[158] *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1029 (10th Cir. 2022) (emphasis added).

[159] *Id.* (internal quotation marks and citation omitted).

[160] *Hosanna-Tabor*, 565 U.S. at 190.

[161] *Our Lady*, 140 S. Ct. at 2067.

pointed to several factors that may be relevant to the determination, including the employee's title,[162] "degree of religious training,"[163] whether they were held out as a minister,[164] and their role "conveying the Church's message and carrying out its mission."[165]  In a recent decision, *Our Lady of Guadalupe School v. Morrissey-Berru*, the Supreme Court reaffirmed the fact-specific nature of the determination and rejected the notion that a single factor—specifically, the title of minister—is dispositive.[166]  While the employee's title may be relevant, of course, the Court reasserted that "[w]hat matters . . . is what an employee does."[167]  There, the Court found that two teachers fell under the ministerial exception where there was "abundant record evidence that they both performed vital religious duties, such as educating their students in the Catholic faith and guiding their students to live their lives in accordance with that faith."[168]

In moving for summary judgment, Defendants have the burden of presenting sufficient evidence to prove Bell was a minister[169]—namely, that he was "entrust[ed] . . . with the responsibility of educating and forming students in the faith."[170]  If Defendants meet that burden, the burden then shifts to Bell to "bring forward specific facts showing a genuine issue for trial."[171]  Given the fact-specific nature of the determination, the applicability of the ministerial exception therefore turns on the circumstances of Bell's employment.

---

[162] *See Hosanna-Tabor*, 565 U.S. at 191.

[163] *Id.*

[164] *Id.* at 191–92.

[165] *Id.* at 192.

[166] *Our Lady*, 140 S. Ct. at 2067.

[167] *Id.* at 2064.

[168] *Id.* at 2066.

[169] *Skrzypczak v. Roman Catholic Diocese*, 611 F.3d 1238, 1243 (10th Cir. 2010) (noting that "the Diocese bears the initial burden").

[170] *See Our Lady*, 140 S. Ct. at 2066.

[171] *Skrzypczak*, 611 F.3d at 1243.

Defendants emphasize that Bell's one-year teaching contracts directly referenced policies affirming "[t]he distinctive Catholic identity and mission of the Catholic school," which "depend on the efforts and examples of the whole faculty."[172]  In relevant part, Policy 2200 of the JMCHS administrative handbook further explains that "[a]ll teachers in Catholic schools share in the catechetical ministry.  Their daily witness to the meaning of mature faith and Christian living has a profound effect on the education and formation of their students."[173]  Therefore, JMCHS expected teachers to "[s]upport[] and implement[] the mission/philosophy of Catholic education and the school," "give[] evidence of lived Gospel values," and "[p]articipate[] in building faith community."[174]  Defendants further stress Bell's 2018–2019 employment contract reaffirmed that "Catholic Schools are . . . not simply places where secular subjects are taught; [they] are an integral part of the faith community that exists primarily to create an environment which advances students' knowledge and love of Jesus Christ."[175]

At the same time, Defendants acknowledge—for summary judgment purposes—that Bell, a non-denominational Christian, "did not teach religion or lead his students in prayer or at mass, nor was he required to participate in religious training."[176]  They nevertheless maintain that the pedagogical expectations of JMCHS, contained within its administrative handbook and referenced by Bell's employment contracts, support the application of the ministerial exception.[177]  Defendants further contend that JMCHS's expectations for teachers—even lay teachers—are so dispositive to the application of the ministerial exception that the court should

---

[172] *See* Dkt. 26-5.

[173] *Id.*

[174] *Id.*

[175] Dkt. 26 at 3.

[176] Dkt. 33 at 19.

[177] *See id.* at 15–20; Dkt. 26 at 10–13.

"hold that [JMCHS's] teachers are ministers, and its employment decisions related to its ministers are protected under the ministerial exception."[178]

Yet, even as Defendants ask for a sweeping application of the ministerial exception for all JMCHS teachers who signed teaching contracts cross-referencing certain ecumenical and pedagogical policies, they try to circumvent the "case-by-case fact-intensive" nature of the inquiry described by the Supreme Court in *Our Lady* and *Hosanna-Tabor*.[179]  While the Supreme Court has remarked that a "religious institution's explanation of the role of its employees in the life of the religion is important," it stopped short of calling it dispositive or even more important than other factors.[180]  On the contrary, the Supreme Court has repeatedly disavowed a "rigid formula" in determining whether a given employee falls under the ministerial exception and instructs that "a variety of factors may be important."[181]  It explained that "[w]hat matters, at bottom, is what an employee does."[182]

In *Our Lady*, the Supreme Court gave great weight to the schools' expectation that teachers carry out the mission of the church, as well as "the schools' definition and explanation of [the teachers'] role," but it did not consider these factors alone.[183]  It also observed that the teachers "performed vital religious duties" and "were entrusted most directly with the

---

[178] Dkt. 26 at 13.

[179] *See Tucker* 53 F.4th at 623 ("[W]hether an employee qualifies as a minister involves a case-by-case fact-intensive inquiry, as the Supreme Court has clearly recognized."); *see also Our Lady*, 140 S. Ct. at 2063 ("In determining whether a particular position falls within the *Hosanna-Tabor* exception, a variety of factors may be important."); *Hosanna-Tabor*, 565 U.S. at 190 – 94 (applying a fact-intensive test to determine whether the ministerial exception applied to a given employee).

[180] *Our Lady*, 140 S. Ct. at 2066.

[181] *Id.* at 2063.

[182] *Id.* at 2064.

[183] *See id.* at 2066.

responsibility of educating their students in the faith."[184]  Additionally, "[t]hey prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities."[185]  Although the teachers were not necessarily titled as ministers and had "less formal religious training" than others, "their core responsibilities as teachers of religion were essentially the same."[186]  Similarly, in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, the school's expectation that teachers "lead others toward Christian maturity" and "teach faithfully the Word of God" was only one of several factors considered by the Court[187]—alongside the formal title of the employee, degree of religious training received, and responsibilities teaching religion and leading religious services.[188]  In both of these cases, there was a recognition that the employees were ministers largely because they were "entrusted with the responsibility of 'transmitting the . . . faith to the next generation.'"[189]

The multitude of factors considered by the Supreme Court in both *Our Lady* and *Hosanna-Tabor* is decidedly missing here.  Notwithstanding JMCHS's policy emphasizing the "catechetical ministry" of all teachers, Bell did not teach his students religion or facilitate religious services.  In fact, the very same policy—Policy 2200—expressly barred Bell, a non-Catholic, from teaching any Catholic religion classes.  As opposed to the *Our Lady* and *Hosanna-Tabor* plaintiffs, Bell avers he "was never required to take religion courses or

---

[184] *Id.*

[185] *Id.*

[186] *Id.*

[187] *See* 565 U.S. at 192.

[188] *See id.* ("In light of these considerations—the formal title given [the employee] by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church— we conclude that [the employee] was a minister covered by the ministerial exception.").

[189] *See Our Lady*, 140 S. Ct. at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 192).

participate in any 'faith-based workshops or meetings.'"[190] Additionally, he maintains that he "accompanied students to mass only occasionally, when he was substitute teaching," and "never led his students in prayer . . . [n]or was he ever asked to do so"[191]

The lack of facts showing Bell either performed "vital religious duties" or was "entrusted with the responsibility of 'transmitting the [] faith to the next generation'" distinguishes the present case from both *Our Lady* and *Hosanna-Tabor*.[192]  In those cases, the plaintiffs taught religious classes, led religious services,[193] and received at least some religious training.[194]  While the record shows that Bell agreed to "respect . . . the teachings and practices of the Catholic Church" and acknowledged the religious pedagogy of JMCHS,[195] these facts alone do not compel application of the ministerial exception.[196]  Indeed, it would be a remarkable expansion of the ministerial exception for the court to hold, as Defendants urge, that all JMCHS teachers necessarily joined the Catholic ministry based on the policies cross-referenced in their one-year employment contracts—without any consideration of the work the teachers individually

---

[190] *See* Dkt. 30 at 18.

[191] *Id.*

[192] *See Our Lady*, 140 S. Ct. at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 192).

[193] *See id.* at 2068 (noting that one of the employees taught religion, "prayed with her students, taught them prayers, and supervised the prayers led by students"); *Hosanna-Tabor*, 565 U.S. at 192 (noting that the employee "taught her students religion four days a week, and led them in prayer three times a day," as well as led a school-wide chapel service every year").

[194] *Our Lady*, 140 S. Ct. at 2058 (stating that the teachers had "limited formal religious training"); *Hosanna-Tabor*, 565 U.S. at 191 ("To be eligible to become a commissioned minister, [the employee] had to complete eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher.").

[195] *See* Dkt. 26-4.

[196] *See, e.g., Palmer v. Liberty Univ.*, No. 6:20-cv-31, 2021 U.S. Dist. LEXIS 248963, at *25 (W.D. Va. Dec. 1, 2021) (holding that a teacher was not a minister where she had only a "mere obligation to integrate a Christian worldview into her curriculum," and there was limited evidence that she actually did so); *Ostrander v. St. Columba School*, No. 3:31-cv-175, 2021 U.S. Dist. LEXIS 135061, at *17 (S.D. Cal. July 19, 2021) (holding that the ministerial exception did not apply where the school's primary evidence was what the teacher was "*supposed* to do, not what she *actually* did"); *Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 496 F. Supp. 3d 1195, 1207 (S.D. Ind. 2020) (holding that the ministerial exception did not apply at the pleading stage where the teacher had overwhelmingly secular daily responsibilities and did not lead prayer or other religious services).

performed at the school.[197]  While the court stops short of deciding the ministerial exception does not apply to Bell's claim—a question that has not been presented—it is clear that Defendants have not met their burden of presenting evidence to establish as a matter of law that Bell was a minister.  Additionally, Bell has countered Defendants' case for the ministerial exception with specific facts showing that, at most, there exists "a genuine issue for trial."[198] Accordingly, summary judgment must be denied.

**CONCLUSION**

For the reasons stated, Defendants' Motion for Summary Judgment[199] is DENIED.

SO ORDERED this 22nd day of May, 2023.

BY THE COURT:

_____

ROBERT J. SHELBY

United States Chief District Judge

---

[197] *See* Dkt. 26.

[198] *Skrzypczak*, 611 F.3d at 1243 (explaining plaintiff's burden to survive a ministerial exception defense at the summary judgment stage).

[199] Dkt. 26.